*JURY TRIAL DEMANDED*

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| EDWARD "COACH" WEINHAUS, | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| VS. | ) | |
| | ) | |
| ALABSERIES.COM, a business partnership, | ) | |
| TARIK FAOUD AJAMI, an individual, | ) | |
| ANDREW HUNTER, an individual, and | ) | |
| JOHN DOE #1, and JOHN DOE #2, | ) | |
| | ) | Trial By Jury Demanded |
| | ) | |
| Defendants. | ) | |

## COMPLAINT FOR EQUITABLE AND LEGAL RELIEF

Plaintiff, EDWARD "COACH" WEINHAUS, (hereinafter "COACH") an individual, does bring this Complaint at Law for Defamation, Intentional Invasion of Privacy, Intentional Interference with Business Relationships, Intentional Infliction of Emotional Distress, and Product Disparagement, against Defendants, ALABSERIES.COM, a New York business partnership, TARIK FAOUD AJAMI (hereinafter "TARIK") an individual, ANDREW HUNTER (hereinafter "ANDREW"), John Doe #1 known as MICHAEL with last name unknown, an individual (hereinafter "MICHAEL"), and John Doe #2 known as "JULIUS the Intern" (hereinafter "JULIUS"), actual name unknown, an individual. Together, they are hereinafter referred to as "DEFENDANTS."

## SUMMARY

A rogue judge in Illinois (the Hon. Regina A. Scannicchio) forbade Illinois-resident children from being inside the State of Illinois in one of the many abuses of the family law system around the country. A father had the temerity to fight back on behalf of his children. Then, a group of "enterprising" east-coast lawyer-podcasters defamed the father while seeking to degrade his well-known law partner, ignoring the severity of abuse in the legal system and violating their ethical

duties. Along the way, the lawyer-podcasters falsely claimed the Plaintiff sued his own children and ignored the truth to aggrandize their own egos. This Complaint in law and equity follows.

## NATURE OF THE ACTION

1. This is an action in diversity for Defamation, Intentional Invasion of Privacy, Intentional Interference with Business Relationships, and Intentional Infliction of Emotional Distress arising out of statements published via a podcast on February 6, 2020, and in violation of Missouri Rev. Stat. 516.140, Missouri Common Law, and California Product Disparagement Law.

## JURISDICTION AND VENUE

2. This Court has diversity jurisdiction as this controversy exceeds and seeks damages greater than Seventy-Five Thousand Dollars ($75,000.00) involving parties with complete diversity of citizenship. Further it includes injunctive relief. 28 U.S.C. § 1332.

3. Each of the individual defendants live in a state other than Missouri. The general partnership defendant ALABSERIES.COM consists of partners who are all non-residents of Missouri and whose principal place of business is not in Missouri.

4. DEFENDANTS' actions and offending statements were targeted at a Missouri unincorporated association (Ste. Monique Appellors, LLC, hereafter "SMA") and Missouri resident COACH with an intent to do harm in Missouri specifically. Further, the harmful statements were published in and broadcast over the web into the State of Missouri for that purpose.

5. The actions taken herein by all DEFENDANTS all had their intended tortious effect against the PLAINTIFFS in St. Louis County, Missouri. DEFENDANTS were aware they were reaching into Missouri when they took direct aim at Missouri in their podcast not only by targeting a Missouri limited liability company and resident, but further mocking the state's pronunciation (which is a matter of some debate[1]) where they made COACH's residence a

---

[1] *Eg.* https://www.oyez.org/cases/1993/93-397 Opinion Announcement, Justice Clarence Thomas May 23, 1994. Justice Thomas worked in Creve Coeur, Missouri across Olive Blvd.

central topic as part of the abuses described herein. DEFENDANTS were highly aware of their attack on Missouri, Missourians, and a member of a Missouri limited liability company licensed in Missouri for being from Missouri when they took these actions.

6.   COACH is a resident of the state of Missouri, in St. Louis County, and is a member of SMA which is also headquartered in St. Louis County at whom the targeted actions took aim. Thus, Venue is proper in this Court. 28 U.S.C. § 1391(b)(2).

## FACTS RELATED TO THE PODCAST

7.   Defendant TARIK was at all times relevant an attorney, and upon information and belief, a resident of the State of New York, but in no event Missouri.

8.   Defendant ANDREW was at all times relevant an attorney, and upon information and belief, a resident of the District of Columbia, but in no event Missouri.

9.   Defendant MICHAEL was at all times relevant an attorney, and upon information and belief, a resident of the State of New Jersey, but in no event Missouri.

10.  Defendant JULIUS the Intern was, upon information and belief, at all times relevant a resident of the State of Delaware, but in no event Missouri.

11.  Defendant, ALABSERIES.COM was, upon information and belief, a New York general partnership between TARIK, ANDREW, and MICHAEL.

12.  At all times relevant, the individual Defendants were the owners, creators, producers, publishers, moderators, and commentators of the ALABSERIES.COM podcast directed and marketed over the web related to legal topics.

13.  On or about February 6, 2020, DEFENDANTS created, produced and published a podcast entitled: "Episode 8: The Lawyer Brain, Part 3: The Counterclerk" (hereinafter "PODCAST EPISODE") which was then the third part in a three-part series, this one designed specifically to attack other attorneys.

---

from SMA's Creve Coeur address. Justice Thomas pronounces "Missouri" with the "long e."

14.  PODCAST EPISODE was broadcast and otherwise published nationwide via platforms such as Spotify, Apple and the ALABSERIES.COM website and directly targeted audiences in Missouri because its two targets were both affiliated with the state of Missouri, which was a key part of the topic of the Podcast Episode.

15.  PODCAST EPISODE's topic of conversation was initially the career arc of THE COUNTERCLERK who attended university in Missouri which the DEFENDANTS highlighted in terms of contrasting his Missouri education with his later academic success.

16.  DEFENDANTS sought to show how THE COUNTERCLERK had risen to the highest levels of the law having clerked for Supreme Court Justice Scalia only to fall to the lowest levels by professionally affiliating himself with Plaintiff COACH.

17.  To make their point as to how far the COUNTERCLERK had 'fallen,' DEFENDANTS knowingly and recklessly disparaged and worked to humiliate COACH, placing him in a false light before the legal community, his social circle, his children, and his family.

18.  PODCAST EPISODE contains numerous false, derogatory, insulting, harmful, offensive, and defamatory statements directed towards COACH in his professional and personal capacities.

19.  The Attorney DEFENDANTS each violated their ethical duties as attorneys by misrepresenting the law, the actions of courts, the actions of COACH, all in the hopes of furtherance of their own careers and their egos, to which they admitted.

20.  DEFENDANTS were aware that they were subject to lawsuit and requested THE COUNTERCLERK, a public person, not to sue them while ignoring the detriment they were doing to COACH, his family, personal contacts (current and potential future), students, children, and career.

21.  In so doing, they attacked a private person by lying about him attacking his own children, when in fact he had done his upmost to protect his children from the horrors of the family law system while simultaneously attending law school, teaching at a public university, starting a company, and maintaining full-time employment so that he could help those in need.

## COACH BACKGROUND

22. COACH is presently an attorney licensed to practice law in the State of Missouri, the State of California, and the State of Illinois.

23. In the past, COACH has lived in the UK several times, continental Europe, and Asia several times. He has built a publishing company with staff on six continents, and currently serves as an officer and director of an international financial company with operations throughout North and South America.

24. COACH has served as Faculty Lecturer at the University of California Las Angeles since 2016 where he teaches Law and Entrepreneurship. Additionally, he has served in an Adjunct capacity at Washington University, Pepperdine University, and as an Assistant Professor at the University of Chicago where he taught Booth's first cryptocurrency and blockchain course in 2019. COACH holds five degrees from three countries (including two graduate degrees from Washington University, one from the University of Chicago, and a degree from the London School of Economics). COACH is currently pursuing a sixth degree in a doctoral research program at Washington University in St. Louis. Prior to his academic career, COACH worked at management strategy consultancy, the Boston Consulting Group, had built several successful startups, worked as a credentialed reporter on Capitol Hill, and managed large derivative trading books for major international banks.

25. COACH's reputation, particularly when he teaches students about strategy and the law at UCLA, is one of being a caring and well-respected advisor to his students. Please see attached EXHIBIT A for student reviews of his course UCLA "Entrepreneurial Strategy and the Law" and EXHIBIT B for recent reviews mentoring students in their capstone course work – incorporated herein by reference.

26. In 2006, COACH founded a real estate publishing company ("PRIOR CO"). In 2008, COACH defeated law firm Jones Day in litigation, which had made the mistake of representing themselves when litigating against COACH. No. 1:2008-cv-04572 – Dkt. # 55 November 13,

2008 (N.D. Ill. 2008).

27.   In 2014, COACH demanded PRIOR CO sue one of its major shareholders and PRIOR CO's then-CEO on behalf of all members. PRIOR CO authorized COACH to proceed with the suit on its members' behalf, and thus, COACH began investigating attending law school, in order to more effectively prosecute PRIOR CO Members' claims and share his knowledge of law and business strategy with future students.

28.   In 2015, COACH won a dissolution of marriage with the mother of his five children which he had filed in Illinois state court in Cook County in 2012 (after agreeing to drop his 2011 action in Missouri).

29.   A month after the final dissolution order, COACH enrolled in law school at Washington University in St. Louis to assist PRIOR CO Members in gaining redress in the upcoming lawsuits and to expand his ability to teach students about business strategy using the law. At the same time, he began teaching at Washington University and founded a company in the cryptocurrency space, all while maintaining his work as a consultant.

30.   In 2016, PRIOR CO's Members sued PRIOR CO's CEO after PRIOR CO's Board afforded COACH legal authorization to direct the litigation on behalf of PRIOR CO's Members. COACH won financial redress on behalf of all PRIOR CO's Members in a second, separate action COACH directed against attorneys on PRIOR CO's Members' behalf in a settlement authorized by PRIOR CO.

31.   Meanwhile, the post-divorce decree judge, the Hon. Regina A. Scannicchio ("SCANNICCHIO") had a marked unfamiliarity with the family situation having just recently been assigned to the case. Parents suffer inordinately at the hands of state court judges as to matters of state law without federal review (which is generally barred by the *domestic relations exception* to federal diversity jurisdiction), and all the more so with judges who have never personally experienced the role of being a parent (upon information and belief, this applies to SCANNICCHIO).

32.  SCANNICCHIO's lack of parental experience by itself would not have led to the subsequent catastrophic consequence she has heaped upon the Weinhaus children. Rather, her disrespect for her own colleague created the environment for her to abandon any compassion for parents. SCANNICCHIO showed disdain for the appointment (and not election) of the dissolution judge, Hon. Gregory Ahern, Jr. (This Chicago Tribune article discusses Judge Ahern's appointment – https://www.chicagotribune.com/news/ct-met-supreme-judges-20121223-story.html last visited January 28, 2022).

33.  Judge Ahern had helped craft a joint custodial settlement in the admittedly protracted dissolution. SCANNICCHIO's disrespect for any of Judge Ahern's work product led her to believe she needed to "fix" Judge Ahern's "mistake" who had granted COACH flexibility due to his prior international lifestyle, history of traveling, and residence in the family's longtime hometown of Creve Coeur in the neighboring Missouri.

34.  After having only been assigned to the case for several months, SCANNICCHIO issued a strange threat to 'fix Ahern's mistake' resulting in an order of temporary nature in April 2016 (the "BANISHMENT ORDER"). The BANISHMENT ORDER required the Illinois-resident children out of the state of Illinois for much of COACH's time with them. As such, the Illinois resident children were allowed to be in Wisconsin, Missouri, California, Washington, D.C, New York, Mexico, Israel, and even Pyongyang, North Korea with COACH requiring no further permission from anyone (except the US State Department in the case of Pyongyang). At the same time, the Illinois resident children were not allowed to be in Chicago, Highland Park, Springfield, or Champaign – or anywhere else within the boundaries of Illinois, their home-state - when with their Missouri-based father.

35.  SCANNICCHIO continued to find COACH a perfectly suitable custodial parent to make unfettered travel decisions worldwide for the children as did Judge Ahern; she merely sought to restrict the children's enjoyment of their own state Illinois when with COACH with no basis in their best interests or safety. She temporarily reversed her BANISHMENT ORDER for one

weekend in May 2017 when its outlandish banishment condition needed to be suspended so COACH's daughter could attend her own Illinois dance recital on COACH's weekend. But rather than end the children's 'banishment' permanently, SCANNICCHIO merely immediately reinstated it.

36.   COACH naturally sought to end what amounted to an illegal banishment for himself and his children by seeking modification of the BANISHMENT ORDER due to changing circumstances (his employment at the #1 public university in the country, UCLA) and the best interests of the children through the traditional legal channels. SCANNICCHIO refused to schedule hearing much less end the children's banishment from their home state, turning what are supposed to be modifiable and temporary post-decree orders into a 'permanent' banishment (a punishment requiring full due process of law since the *Magna Carta*).

37.   Back to COACH's forthcoming legal career…in the Spring of 2017, COACH invested in financially supporting a legal podcast covering the United States Supreme Court run by his law professor at Washington University (which has a policy of blind grading) and another professor who became his future law partner in SMA ("THE COUNTERCLERK").

38.   THE COUNTERCLERK is widely known to be the only counterclerk for Justice Scalia at the Supreme Court who also worked for Justice Kagan upon her nomination to the Supreme Court when she was serving as Solicitor General. THE COUNTERCLERK is without peer in this way, which is why he later became a target of the DEFENDANTS in the PODCAST EPISODE.

39.   In April 2018, the effects of the BANISHMENT ORDER (and SCANNICCHIO's refusal to hear modification) necessitated action to mitigate the harm to the children. COACH sued the State of Illinois and several private citizens in the Northern District of Illinois for violations - both 'protected by' and not protected by the illegal BANISHMENT ORDER - of his Right to Travel, which is one of the two rights of action for civil rights violations against private citizens pursuant to 42 U.S.C. § 1985(3). (the "RIGHT TO TRAVEL ACTION").

8

40.   Contemporaneously, COACH sued his former family law counsel in the Northern District of Illinois in a diversity action for malpractice for allowing the BANISHMENT ORDER to be entered without constitutional or procedural objection and refusal to conduct a hearing ("MALPRACTICE ACTION") after his former counsel had erroneously filed a petition seeking fees in front of SCANNICCHIO, where counsel knew it would get sympathetic ear.

41.   SCANNICCHIO, rather than schedule any hearing to modify the BANISHMENT ORDER, scheduled an expedited hearing and waived COACH's former counsel's statutory obligation to mediate the fee petition in an attempt to quickly and financially punish COACH for having filed the RIGHT TO TRAVEL ACTION.

42.   On September 10, 2018, COACH won financial redress as result of the MALPRACTICE ACTION in a settlement and stipulated order entered by the Honorable Robert M Dow, Jr. No. 1:18-cv-02868 (N.D. Ill.). The same day, COACH notified SCANNICCHIO that her court could no longer rule over any fee petition between COACH and his former counsel by the superior authority of the Hon. Judge Dow, Jr. and the Northern District of Illinois' injunction. See EXHIBIT C for a true and correct copy of COACH's notification to SCANNICCHIO barring her courtroom from jurisdiction over the erroneous fee petition, incorporated herein by reference.

43.   SCANNICCHIO was noticeably angered by the RIGHT TO TRAVEL ACTION and even more so the settlement of the MALPRACTICE ACTION before she could grant the former counsel's fee petition on an expedited basis by ignoring the statutory mediation requirement.

44.   On September 12, 2018, in one of her fits of pique, SCANNICCHIO robbed COACH of the right to speak to his own counsel, as detailed in Attorney Steven Ross' Letter to SCANNICCHIO's supervisor. See EXHIBIT D for a copy of the Ross Letter incorporated herein by reference. (COACH won the proceeding anyway but with continued petty revenge from SCANNICCHIO which lent further harm to the Weinhaus children.)

45.   On September 14, 2018, the Northern District of Illinois dismissed the RIGHT TO

TRAVEL ACTION on the *merits* and for *jurisdictional* reasons.

46.   On December 3, 2018, COACH filed an appeal to the Seventh Circuit of the recent Northern District of Illinois' decision related to both the *merits* and *jurisdiction*, in the midst of his final exams for law school and other professional and academic obligations.

47.   In June 2019, COACH and the children's mother settled their differences related to the children. The children's mother requested COACH serve exclusively as full-time residential, custodial parent to several of the children, the first of which was embodied in an agreed order SCANNICHIO entered ("FIRST SOLE CUSTODY ORDER"). See EXHIBIT E for the FIRST SOLE CUSTODY ORDER, incorporated herein by reference but for redacting out children's names pursuant to court rules.

48.   As a result of the FIRST SOLE CUSTODY ORDER, COACH agreed to drop all litigation against the children's mother, including the RIGHT TO TRAVEL ACTION. Similarly, COACH and one of the other Defendants also settled. This information was memorialized in filings in the federal court system (*e.g.* PACER) on multiple occasions between June 2019 and February 6, 2020. *Eg.* U.S. Supreme Court No. 19-778 Dkt. Filing Oct. 1, 2019 fn. 1,2; Dkt. Filing December 12, 2019 fn. 1. (After COACH's Seventh Circuit win granting him the ability to bring state court claims, *infra*, COACH settled with a *third* litigant in the RIGHT TO TRAVEL ACTION.)

49.   On July 16, 2019, the Seventh Circuit Court of Appeals ruled on COACH's appeal. COACH earned a *modification* of the Northern District of Illinois' prior order. The Seventh Circuit removed any *merits* basis of the lower court's ruling. The Court affirmed only the jurisdictional basis for dismissing the RIGHT TO TRAVEL ACTION due to the Seventh Circuit's unique application among the circuit courts of the *domestic relations exception* to federal diversity jurisdiction. Only the Seventh Circuit uniformly applies the exception to matters of a *federal question*.

50.   As a result of winning modification of the lower court in the Seventh Circuit, COACH was

able to pursue his RIGHT TO TRAVEL ACTION against the State of Illinois and against private citizens in appropriate state courts without being barred by preclusion. The right to refile is, as a matter of law and common sense, significant redress to have earned by a non-licensed *pro se* litigant one court beneath the Supreme Court. That is where COACH would go next to challenge the Seventh Circuit's solo interpretation of the jurisdictional issue.

51.   On September 23, 2019, the Seventh Circuit Court of Appeals, having earlier stated it *may* levy financial sanction against COACH for pursuing a case it found subject to the *domestic relations exception* to federal diversity jurisdiction, opted not to, citing from COACH's brief *Blixseth v. Yellowstone Mountain Club, LLC*, 854 F.3d 626, 631 (9th Cir. 2017); *Sun-Tek Indus., Inc. v. Kennedy Sky-Lites, Inc.*, 865 F.2d 1254, 1255 (Fed. Cir. 1989). The Seventh Circuit panel stated, "We therefore award no additional fees under Rule 38." Seventh Circuit Court of Appeals, No. 18-3185, Dkt. Entry September 23, 2019.

52.   Just after his partial victory in the Seventh Circuit and passing the July 2019 Missouri Bar Exam, COACH became a member of the Missouri bar and eligible to join a law firm.

53.   THE COUNTERCLERK, being without peer with his particular legal experience (*supra* re Scalia and Kagan), sought a complementary skillset to his own.

54.   COACH and THE COUNTERCLERK formed SMA in the fall of 2019. They each invested significant time and expense in furtherance of the success of this professional enterprise.

55.   On December 12, 2019, COACH filed a Petition for Writ of Certiorari to the United States Supreme Court, demonstrating that the Seventh Circuit sits alone against the other five circuits which have faced the same jurisdictional issue when the issue in a domestic relations context is a matter of *federal question*, such as the RIGHT TO TRAVEL ACTION.

56.   The Supreme Court of California invited COACH's membership to its bar in January 2020, and the Supreme Court of Illinois invited his membership to its bar soon thereafter, both of which he joined.

57.  In February 2020, COACH traveled to Chicago to discuss the children with SCANNICCHIO, the children's attorney (who requested the discussion), and the children's mother who was ordered to attend the conference but did not do so.

58.  While waiting for his own case to be called, COACH witnessed SCANNIGGHIO trample on the basic civil rights of an African American, unwed mother seeking to find the father of her two-year old child. SCANNICCHIO sentenced the two-year old's only known parent to seven days in prison after ordering an illegal search and seizure in the courtroom. SCANNICCHIO admitted the elements of the illegality of the search which was captured in a court transcript.

59.  COACH waited months, until his own case was no longer in front of SCANNICCHIO (so he thought), to report SCANNICCHIO to the Judicial Inquiry Board for her abuses of her power as it related to the single mother and her fatherless child. COACH was required by Illinois Supreme Court rule (Ill. Prof. R. Cond. § 8.3(b)) to file the report which he did hoping to mitigate the negative effect on his children. Three other licensed professionals had agreed to participate should the Judicial Inquiry Board choose to investigate.

60.  COACH continues to seek opportunities to help his children, his students, his clients and his colleagues in the face of the PODCAST EPISODE's false, defamatory, and harmful publication in February 2020.

## DEFENDANTS' FALSE, DEFAMATORY AND HARMFUL STATEMENTS ABOUT COACH

61.  As part of the DEFENDANTS' efforts to humiliate and degrade COACH, the PODCAST EPISODE included numerous false and defamatory statements (noted with an "~" to approximate the timestamp on the recording as published):

   a)  "Edward 'COACH' Weinhaus is probably the biggest pimp." (~76 minutes). Describing COACH as a "pimp" at all, in any fashion, is false and defamatory, adding in the superlative of 'biggest' was done for pure malice.

   b)  "[COACH has] taken his [ex-] wife and her parents, her septuagenarian parents too and

his five children to the Supreme Court." (~81 minutes).  COACH has never sued his own children, and nobody had said that he had until the DEFENDANTS invented this accusation out of thin air. Further, COACH had settled with his ex-wife and very specifically did not take her to the Supreme Court, as noted in the public filings, *supra*. Finally, COACH had also settled with his ex-mother-in-law whom he did not take to the Supreme Court. These statements are all false and harmful to COACH's personal and professional reputation.

c)  "COACH has somehow mortgaged his home to keep it from [his ex-wife] and is using that money to fund [SMA]." (~84 minutes). This is false and disparaging for many reasons. First, public records show that COACH had the same mortgage on his home since 2007 at the time of publishing all the way through all of 2021. Second, COACH in fact won the family home in the divorce free and clear. The mother of his children had quit claim deeded her interest to him by order of court in 2015 as a result of the divorce litigation (where he had an appearance in the case). These are all matters of public record and was covered in the Illinois Trial Court Divorce Digest in 2015 Volume 6 Issue 7, "Wife Strikes Out" (which credited his former counsel). Third, the DEFENDANTS failed to uncover the fact *hidden in plain sight* that COACH had already been financing THE COUNTERCLERK's former podcast and as such the two were already business associates, requiring no 'big mortgage' to start a business. Fourth, the suggestion that COACH, a respected and successful entrepreneur, who was known at the time to be president of a company when the PODCAST EPISODE was published needed to go into debt to start an appellate practice with THE COUNTERCLERK disparages all of COACH's career accomplishments and reputation, including his academic position at UCLA. Finally, DEFENDANTS suggest that COACH has no comparable contribution to SMA other than 'money' from their invented mortgage, when instead COACH and THE COUNTERCLERK brought complementary skillsets to SMA.

d) "[COACH is] filing 75 motions [in the Seventh Circuit.]" (~79 minutes). This is wrong by more than an order of magnitude and in no way relates to anything close to the truth. Further, this particular comment lends credence to the idea that COACH deserved some financial sanction (which he never received) for burdening the COURT with a multitude of motions, affecting his professional reputation. It also suggests that COACH, through over-filing, does not have sound professional judgment, which is the resulting inescapable conclusion from this false, disparaging, and defamatory statement. This coupled with the omissions is false in a way nobody could mistake as intending to cause harm to COACH's reputation.

e)  "And it's clear, [COACH] went to law school for the sole reason that he could try these cases *pro se* [against his ex-wife in federal court]. And these are the only cases, like I'm not leaving anything out. I just read you his entire f$%^ing Pacer. And they all kick off like right when he gets like in June 2018…" (~78 minutes). Again, there are many aspects to this series of statements that are false and defamatory. First, COACH went to law school for business reasons and ultimately so he could teach law as noted, *supra*. Second, neither COACH nor anybody else needs to go to law school to try a case "*pro se*", self-representation being one of our fundamental rights a fact that attorneys ought to know; DEFENDANTS here mislead their audience to disparage COACH. Coupled with this misstatement is the omission that COACH was able to appear on his own behalf and win, many times, in state court well before he ever attended law school. Third, as noted above and below, DEFENDANTS certainly did not identify all the references to COACH in PACER, and their omissions are rather stark in that they vindicate the business need for understanding the law, especially for suing lawyers. Fourth, DEFENDANTS' refusal to even look at the state courts where COACH was known to have cases (such as Illinois) would have shown the falsity of this statement. But DEFENDANTS chose to make a false and thoroughly debunked statement instead.

f) "COACH filed six criminal complaints with the police against [his ex-wife.]." (~82 minutes). This statement too is false – the DEFENDANTS are parroting an intentionally false statement in a pleading which is completely refuted by public records and even the document they cited. The Skokie Police Detective Ron Glad filed six *citations* against COACH's ex-wife prior to the divorce decree for violations of Illinois criminal law, as a result of the investigation that his ex-wife had instigated. The equivalent of the Skokie District Attorney prosecuted the citations with the local criminal court after COACH's ex-wife made a multitude of misguided phone calls to the police about COACH. (An example of COACH's ex-wife's police phone calls prior to the divorce decree which are part of the public record and gratefully seem a thing of the past, can be heard here https://www.dropbox.com/s/pvkns3fax933hu7/20141117_natalie3_911_phonecall_skokie_foia.mp3?dl=0 and here https://www.dropbox.com/s/i8e2drec8zzuo0b/20141117_natalie4_911_phonecall_skokie_foia.mp3?dl=0.) *The detective assigned to his ex-wife's investigation interviewed COACH and then issued the citations against his ex-wife.* COACH did not testify in any criminal trial or hearing against his ex-wife and certainly filed no criminal complaint such as those allowed by private citizens in Illinois (*eg.* Form 0654 Cook County Circuit Court).

g) "The next two entries in the docket are [COACH] filing a petition for cert…" (~81 minutes). This statement came just after stating that COACH was referred to the State Bar of California. This is a false statement. Before filing for 'cert', the Seventh Circuit Court of Appeals granted COACH a victory relating to the sanctions by issuing no financial sanction. COACH, prior to becoming an attorney, beat any purported sanction from the Seventh Circuit, *supra*. Rather than tell the truth, the DEFENDANTS purposely mis-stated the docket to avoid displaying COACH's legal acumen in defeating financial sanction, choosing to hide COACH's wins from their audience in an attempt to disparage COACH with prevarications.

h) "I don't even think he even knew what [SMA] was named after up until that moment."
(~75 minutes). DEFENDANTS suggest COACH had no idea of the source of the name
of his own law firm and a level of ignorance unbecoming a partner in a professional
services firm like SMA. Had DEFENDANTS performed even a modicum of research,
they would have discovered that a firm name of the partners' last names would have
been COACH's eminent father's legal name. But DEFENDANTS would rather have
painted COACH as unaware or stupid than affording him the basic consideration as a
devoted and respectful child of one of this country's top advocates for patient rights and
then-member of the Supreme Court bar. (S. Sheldon Weinhaus passed on October 17,
2021.)

i) "You find out that this is the most family court thing that has ever happened… [~73
minutes…Family Court is called Family Court because it's in Family Court right like IT'S
NOT IN REAL COURT. [~78 minutes] … literally family court the law firm [~83
minutes] …these guys [THE COUNTERCLERK AND COACH] met on some divorce
dad forum [~84 minutes]." Each and every part of these statements is false, and
DEFENDANTS were aware of the false nature of the statements at the time they were
made. Nonetheless, DEFENDANTS preferred to disparage COACH. First, children
being banished from their own state is not only not 'the most family court thing that has
ever happened' it has never elsewhere happened in any family court. In fact, in
COACH's RIGHT TO TRAVEL ACTION, he states it is the only time this has ever
happened. It has nothing to do with any 'family law,' but is instead in complete violation
of Illinois 'family law' ("the IMDMA") and the US Constitution, about which he is
certainly correct, and which led to his $60,000 redress in the MALPRACTICE ACTION.
Second, 'Family Court' is not in any way different from any other court in Illinois
because all courts in the Unified Illinois Court System are courts of general jurisdiction as
defined in the Illinois Constitution. SCANNICCHIO's court is very much a real court

which is why she was able to sentence the only parent of the 2-year-old (the third-party unwed mother) to seven days in prison in February 2020 without due process and little to no oversight but for COACH's vigilance. Third, SMA has never once worked on any family law issue (COACH's cert petition was not from SMA) and attempting to connect a boutique appellate practice to COACH's RIGHT TO TRAVEL ACTION by calling his involvement in the partnership as part of "NOT A REAL COURT" disparages COACH. Finally, COACH and THE COUNTERCLERK did not meet on a "divorce dad forum" as noted, *supra*, which was knowable to DEFENDANTS in the same place they 'discovered' that COACH graduated law school.

### DEFENDANTS' PURPORTED DILIGENCE

62. It is evident from DEFENDANT ALABSERIES.COM's website and the quality of the PODCAST EPISODE production, that the DEFENDANTS invested heavily into appearing to be a professional operation.

63. DEFENDANTS repeatedly purported to be diligent in research and investigation, using staff, and emphatically asserting the truth of their statements after research as it related to COACH.

64. About 1 minute into the PODCAST EPISODE, DEFENDANTS described themselves as operating as a business: "I'm excited I think it's a new chapter for this august institution just feels very appropriate for a bunch of lawyers that have unpaid young labor doing yea, doing the legwork…"

65. DEFENDANTS describe their intern JULIUS' strengths as a researcher with the endorsement that "JULIUS is smarter than all of us."

66. Approximately 30 minutes in, the DEFENDANTS describe their "tradition" of asking their audience to go look at websites in a form of following upon their own purported diligence.

67. At around 64 minutes in, DEFENDANTS discuss how this story "takes a little bit of detective work," again, displaying purported diligence.

68.  At approximately 73 minutes into the episode, DEFENDANTS "give credit to JULIUS our intern, for first *discovering* that [COACH] graduate law school in 2018." This fact is about as hidden as the graduation rate of any person with a LinkedIn profile- *i.e.,* not at all. This fact required no 'discovery' nor 'detective work' and the fawning over it suggested a diligence and nefarious intent to conceal by COACH which is completely disingenuous. In fact, COACH earned three graduate degrees in 2018 and 2019 according to his LinkedIn profile.

### DEFENDANTS' INTENTIONAL OMISSIONS SHOW INTENT TO HARM COACH'S REPUTATION

69.  DEFENDANTS purposely omitted many relevant facts they both uncovered and should have uncovered but rather chose to leave out of the PODCAST EPISODE to ensure COACH was used as the butt of their attack against THE COUNTERCLERK. For example:

a) DEFENDANTS bashed law firm Jones Day multiple times from minutes 23 to 26 in the PODCAST EPISODE: "Jones Day is a 'red flag' firm…there are a lot of firms that…. aren't f$%^ing Jones Day which is just this international behemoth that's just the f$%^ing worst…you're working for literal Satan." After stating they researched COACH in PACER and federal court, they failed to note that COACH had personally defeated Jones Day in litigation when Jones Day sued COACH (Jones Day representing themselves in their loss to COACH no less), *supra.*

b) DEFENDANTS called it a "red flag" that COACH is a "crypto guy" at about 76 minutes into the PODCAST EPISODE. Rather than relating the fact, *supra*, available on his LinkedIn that COACH was selected to teach the first cryptocurrency-related course at the University of Chicago (Booth) and had been pursuing doctoral research in the area, DEFENDANTS omitted his academic service, and instead painting with a broad brush of a "red flag." COACH also advised the U.S. House Financial Services Committee staff in the summer of 2019 related to Libra.

c) DEFENDANTS described the trial court in the Right to Travel Action as saying "gtfo"

(*i.e.,* a vernacular for losing which was accurate if crass). However, when describing the Seventh Circuit's decision of July 16, 2019, they intentionally left out the fact that COACH won redress by *modifying* the lower court's order. A *pro se* litigant winning redress from an appellate court is a remarkable fact to ignore, however, DEFENDANTS sought to cover this information up, instead focusing on the purported sanctions which amounted to no financial sanction at all.

d) DEFENDANTS failed to mention that the Seventh Circuit granted COACH's request to deny financial sanctions on September 23, 2019, by purposely omitting this order and falsely describing the docket, *supra*. The purpose of this omission was to attack COACH's level of professional acumen when instead they left out that the Seventh Circuit relied on the citations from COACH's brief to ensure he suffered no financial sanction at all.

e) DEFENDANTS failed to mention COACH's successes as a litigant in both state and federal courts which were immediately available to them and about which they purported to have been diligent.

f) DEFENDANTS failed to note that COACH's litigation tactics had a positive effect in that he won an agreement with this children's mother in the FIRST SOLE CUSTODY ORDER which led to peace with her (and her mother). Likewise, DEFENDANTS failed to note that he won $60,000 redress in settlement of the related MALPRACTICE ACTION, also available on PACER. DEFENDANTS' own lack of experience in the world of 'strategy' had them attack COACH when an honest look at COACH's results would have led them to a far different conclusion. DEFENDANTS' own striking levels of incompetence are no defense to defamation and its harms. Rather than commend THE COUNTERCLERK for attaching himself to a partner with COACH's strategic insight that complemented THE COUNTERCLERK's own mastery of the law, they chose to omit COACH's evident strengths to demonstrate how far THE

COUNTERCLERK had 'fallen.' They failed to consider complementarity and diversity in the practice of the law, a failure that which undoubtedly mars their own practices, was harmful in its effects on COACH's reputation.

g)   DEFENDANTS purposely ignored COACH's history of gaining redress in the court system against lawyers who themselves who have been trying to abuse the system (whether Jones Day, his former counsel, or PRIOR CO's former lawyers). COACH's dogged commitment to excellence among legal professionals has come at incredible risk but also yielded reward for the improvement in the legal profession from adherence to proper standards. Rather than acknowledging COACH's service to the profession undertaken at his own expense, DEFENDANTS lied about their diligence and omitted the central truth about COACH, *he beats lawyers who are misbehaving*. It is no secret then that partners in major law firms choose to co-counsel with COACH once they understand the value his strategic mindset adds to their client representation. DEFENDANTS' omissions and false statements have made that convincing all the more difficult.

70.  DEFENDANTS admitted to seeking to harm COACH's reputation.

71.  About three minutes into the PODCAST EPISODE, the DEFENDANTS stated, "our mission statement here I think for the podcast has always been to tell the unflattering stories about the law and the legal profession and this is certainly well within our wheelhouse you know so I want to be sensitive to not kicking a guy when he's down but I think it would not be doing it justice to our mission if we didn't kick him a little bit…"

72.  DEFENDANTS held hostility towards THE COUNTERCLERK (admitting at about 21 minutes that they had been "irritated by [THE COUNTERCLERK] for many years").

73.  DEFENDANTS used their false statements and intentional omissions about COACH to "kick" THE COUNTERCLERK and took the opportunity to describe COACH in an "unflattering" manner to further this aim.

74. Additionally, the DEFENDANTS were highly aware that their speech specifically affected the trade and profession of COACH and SMA.

75. DEFENDANTS described people struggling in the family law system under the 'abusive discretion' of family law judges as "the worse people" about five minutes into the PODCAST EPISODE, laying the foundation for their later references to COACH.

76. DEFENDANTS describe THE COUNTERCLERK's business endeavor with COACH in SMA as akin to a "Monkey's Paw based on what happens" about 17 minutes into the PODCAST EPISODE and likewise describe his partnership with COACH as "how far [THE COUNTERCLERK has fallen" about 70 minutes into the episode and 85 minutes.

77. DEFENDANTS failed to note the complementary backgrounds and what each might bring to clients in a professional firm that are positive, instead using false and defamatory statements about COACH to kick and harm.

78. DEFENDANTS were highly aware of the problem with omissions in giving a true picture in their publication, even purporting to accuse SMA of using a tactical omission (71 minutes into the episode), "*skipping* the central fact which we explain."

## DEFENDANTS ENTERTAINED SERIOUS DOUBT AS TO THE TRUTH OF THEIR PUBLICATION

79. DEFENDANTS entertained serious doubt to truthfulness and their own culpability, doubt now resolved through this Complaint, related to the publication and demonstrated their insecurity during the PODCAST EPISODE. For example:

   a)  In the introduction, they noted that the script and outline were done by an unpaid intern, JULIUS, and noted "figured we wouldn't drag him down with us…unless any of the stuff he contributed turns out not to be true."

   b)  Additionally, they introduced the episode with the admission "we've been struggling with whether to tell…gone back and forth on this so many times in the last like week."

   c)  About 3 minutes into the episode, "let's start off by saying that again, we've wondered if

this was a story that was right to tell but it's just got too many good and directly on point aspects to it…"

d)   About 4 minutes into the episode, they ask that THE COUNTERCLERK not instigate litigation against them: "Hey, man, I'm sorry about this. Please don't uh, sue us or whatever."

e)   Even within the episode they acted in ways they knew to be absolutely wrong as licensed attorneys, who upon information and belief, practice in federal court. In one example, they published the names of minor children in a particularly cruel fashion when such a behavior is a violation of court rules, making it all the more egregiously culpable for the publication of PODCAST EPISODE.

80.  DEFENDANTS' most overt and intentional admission of likely error shows that they were attempting to use their own inaccuracies to garner a larger audience. About 40 minutes into the episode, DEFENDANTS have the audacity to ask THE COUNTERCLERK to correct them, "[THE COUNTERCLERK], If we're wrong, feel free to tweet at us." Because THE COUNTERCLERK is a public person and the *tweet battle* would bring attention, DEFENDANTS sought to goad THE COUNTERCLERK into a response with intentional inaccuracies and horribly offensive behavior at approximately ~52 minutes.

## COACH EXPERIENCES ONGOING DAMAGE

81.  COACH experienced damage to his personal and professional relationships as a result of DEFENDANTS' actions.

82.  THE COUNTERCLERK's and COACH's investments in SMA were damaged as result of DEFENDANTS' attacks on COACH. COACH lost income as a result of potential client losses and THE COUNTERCLERK's reticence to continue investing in SMA with COACH after he became the target of DEFENDANTS' false attacks.

83.  COACH had to invest and start a new law firm as a result of DEFENDANTS' actions.

84.  COACH's children, other business, familial and personal contacts heard the defamatory,

disparaging, and false statements made by the DEFENDANTS which negatively affected COACH's social standing, personal relationships (current and future), business relationships (current and future), and caused severe emotional harm.

85.  COACH's studies suffered as a result of DEFENDANTS' actions.

86. COACH suffered anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame as a result of DEFENDANTS' actions.

87. DEFENDANTS' mockery at the plight of Illinois children being barred from Illinois by SCANNICCHIO because COACH is from "Missourah" and then falsely claiming COACH took his own children to the Supreme Court justifies unique, specific injunctive relief to begin to remedy the damage.

## EQUITABLE REMEDIES REQUESTED IN EACH COUNT

88.  Due to the ongoing danger to their listening audience, the legal profession, and themselves that DEFENDANTS represent, COACH prays for equitable and injunctive relief designed to right the wrongs in addition to the damages requested below.

89.  As equitable remedies, COACH requests the following ("PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES") in all counts below:

a)  Attorney DEFENDANTS and JULIUS shall attend one full quarter of COACH's course at UCLA at their own expense to understand different aspects of strategy as it relates to law and earn a passing grade for all coursework. They shall use their best efforts to adequately compensate the university for their attendance (none of which is intended to compensate COACH directly);

b)  DEFENDANTS shall publish a next episode of the "Lawyer Brain" series to cover and correct, at COACH's direction with COACH's final authority, the errors in the PODCAST EPISODE relating to COACH, including but not limited to the errors and omissions noted in this Complaint;

c)  DEFENDANTS shall edit the PODCAST EPISODE, their website, and all

advertisements and social media that contains any reference to the PODCAST EPISODE or COACH as follows: i) they will state before and after each section of the PODCAST EPISODE that the original recording contains false statements and has subsequently been corrected by pointing to the NEW EPISODE; ii) DEFENDANTS will republish it on all platforms with this information; iii) on any social media, website, or discussion involving any DEFENDANT as it relates to COACH or the PODCAST EPISODE that the PODCAST EPISODE contains false statements and that the NEW EPISODE corrects those false statements;

d) DEFENDANTS shall create a second new episode ("SCANNICCHIO EPISODE") of their podcast distributed as would any other episode specifically covering the actions of SCANNICCHIO to be titled, "Abusive Discretion" to cover SCANNICCHIO's career of (wittingly or unwittingly) abusing her position to harm parents. DEFENDANTS will pay COACH to assist in producing the SCANNICCHIO EPISODE and will grant COACH final authority on editorial decisions related to the SCANNICCHIO EPISODE.

e) DEFENDANTS shall be enjoined from pronouncing "Missouri" without a "long e" sound at the end on ALABSERIES.COM podcasts going forward if used in a manner intended to imply lack of intelligence or other negative cognitive attribute or in any mocking fashion whatsoever. Eg. mɪˈzʊɹ.i/, /mɪˈzɝ.i would be acceptable in any context but məˈzɝ.ɚ would not be (using the International Phonetic Alphabet).

## COUNT I
### DEFAMATION, LIBEL *PER SE*, and SLANDER *PER SE*

90. COACH restates and reasserts all prior allegations contained in this complaint as if fully stated within this Count.

91. DEFENDANTS published the PODCAST EPISODE which is a publication.

92. DEFENDANTS were negligent in making false and defamatory statements and fully identified COACH.

93.  DEFENDANTS knew that the above statements published on the PODCAST EPISODE were false.

94.  DEFENDANTS acted with reckless disregard to the falsity of their statements by purporting to show diligence and failing to show the diligence they represented.

95.  DEFENDANTS' disregard for the truth related to COACH so that they could spread the false information was intentional to attack THE COUNTERCLERK.

96.  The above false and defamatory statements impute a lack of knowledge, skill, capacity, or fitness to perform COACH's duties as an attorney.

97.  As a result of the DEFENDANTS' false and defamatory statements, COACH's professional reputation in the legal community has been seriously and irreparably damaged.

98.  As a result of the DEFENDANTS' false and defamatory statements and the actions described in previous paragraphs, COACH has suffered and continues to suffer serious and significant financial losses, including but not limited to the loss of clients and reduced opportunities to partner with other attorneys to serve clients.

99.  As a result of the DEFENDANTS' false and defamatory statements and the actions described in previous paragraphs, COACH has suffered and continues to suffer serious and significant personal relationship harms, including but not limited to the loss of trust and respect of current relationships and the opportunities to make lasting and meaningful connections with new personal contacts.

100. As a result of the DEFENDANTS' false and defamatory statements and the actions described in previous paragraphs, COACH has suffered and continues to suffer serious and significant personal familial harms, including but not limited to the loss of trust and respect of his children and other family members.

101. As a result of DEFENDANTS' actions, COACH has suffered and continues to suffer significant pecuniary loss, including actual, and compensatory damages.

102. As a result of the DEFENDANTS' false and defamatory statements, COACH has suffered

and continues to suffer serious mental anguish and severe emotional distress.

103. As a result of DEFENDANTS' intentional, reckless, and malicious actions, COACH is entitled to punitive damages.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS does pray that this Honorable Court enter judgment in his favor and against the Defendants for:

    a) The amount of Ten Million Dollars ($10,000,000.00), plus punitive damages and attorney fees.

    b) The above-listed PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES; and

    c) All other equitable and legal remedies that are fair, equitable and just.

## COUNT II
## INTENTIONAL INVASION of PRIVACY

104. COACH restates and reasserts all prior allegations contained in this complaint as if fully stated within this Count.

105.  DEFENDANTS knowingly subjected COACH to unreasonable and highly objectionable publicity that attributes to him characteristics, conduct, or beliefs that are false.

106. DEFENDANTS acted recklessly in failing to correct the false, unreasonable and highly objectionable before publishing it on the PODCAST EPISODE.

107. Any reasonable person would find DEFENDANTS' treatment of COACH highly objectionable, merely to use COACH as a tool to attack THE COUNTERCLERK and purposely omitting the truthful information as well projecting false information to show how far THE COUNTERCLERK had fallen merely by continuing his prior business relationship with COACH.

108. DEFENDANTS' actions are a major misrepresentation of COACH's character, history, activities, and beliefs.

109. As a result of having been subjected to this highly objectionable and unlawful publicity,

COACH's reputation and stature as an attorney has been damaged in the legal community.

110. As a result of having been subjected to this highly objectionable and unlawful publicity, COACH has suffered and continues to suffer serious and significant financial hardships.

111. As a result of having been subjected to this highly objectionable and unlawful publicity, COACH has suffered and continues to suffer serious and significant personal relationship and familial relationship hardships.

112. As a result of having been subjected to this highly objectionable and unlawful publicity, COACH has suffered and continues to suffer serious mental anguish and severe emotional distress.

113. As a result of DEFENDANTS' intentional, reckless, and malicious actions, COACH is entitled to punitive damages.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS does pray that this Honorable Court enter judgment in his favor and against the Defendants for:

a) The amount of Ten Million Dollars ($10,000,000.00), plus punitive damages and attorney fees;

b) The above-listed PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES; and

c) All other equitable and legal remedies that are fair, equitable and just.

<u>COUNT III</u>
<u>INTENTIONAL INFLICTION of EMOTIONAL DISTRESS</u>

114. COACH restates and reasserts all prior allegations contained in this complaint as if fully stated within this Count.

115. DEFENDANTS knowingly, intentionally, and recklessly subjected COACH to highly objectionable and offensive publicity that was likely to cause him humiliation, embarrassment, indignity, grief, and apprehension.

116. DEFENDANTS' actions were extreme and outrageous behavior for average citizens and

even more so, licensed attorneys who are bound to ethical rules and are expected to be better educated as it relates to the law.

117. DEFENDANTS' actions were intentional, used as a tool, to attack THE COUNTERCLERK, and thus they ignored information that showed COACH in any positive light and attacked him for trying to help his children.

118. In addition to COUNT I, the DEFENDANTS' purposeful omissions after stating they had performed diligence were intended to cause the harms and did cause the harms in this count. Those omissions were intentional and done as part of a pattern to mislead the audience and to maximize DEFENDANTS' use of COACH to attack THE COUNTERCLERK.

119. As a result of DEFENDANTS' actions, COACH has suffered and continues to suffer severe humiliation, embarrassment, indignity, grief, apprehension, and emotional distress. The physical manifestations of DEFENDANTS' actions led to loss of sleep and other negative health consequences as a result of loss of sleep.

120. As a result of DEFENDANTS' actions, COACH has suffered and continues to suffer significant pecuniary loss, including actual, and compensatory damages.

121. As a result of DEFENDANTS' intentional, reckless, and malicious actions, COACH is entitled to punitive damages.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS does pray that this Honorable Court enter judgment in his favor and against the Defendants for:

a) The amount of Ten Million Dollars ($10,000,000.00), plus punitive damages and attorney fees;

b) The above-listed PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES; and

c) All other equitable and legal remedies that are fair, equitable and just.

## COUNT IV
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE

122. COACH restates and reasserts all prior allegations contained in this complaint as if fully stated within this Count.

123. COACH and THE COUNTERCLERK began the SMA law firm with the expectation of representing clients in civil and criminal appeals on a nationwide basis.

124. DEFENDANTS knowingly, intentionally, and recklessly subjected COACH to highly offensive and objectionable publicity with the reasonable expectation that such publicity would interfere with probable future business relations or business expectancy.

125. At the time of the PODCAST EPISODE, COACH had present and probable future existence of contracts, business relations, and business expectancies which would be beneficial to COACH as a licensed attorney seeking to practice his profession.

126. At the time of the PODCAST EPISODE, DEFENDANTS knew COACH's ascendance as an attorney and his existing Missouri license and his expected licensure in California and that he had expectancy of clients and business contacts as a result of becoming an attorney

127. DEFENDANTS's actions of publishing the statements and the material omissions with purported diligence were intended to interfere with COACH's business expectancies and which induced and caused a termination a foreclosure of the business expectancies.

128. As a result of DEFENDANTS' actions causing the end of the business expectancies, COACH has been damaged.

129. As a direct result of DEFENDANTS' unlawful conduct, COACH has been denied numerous business opportunities and future economic benefits.

130. As a direct result of DEFENDANTS' unlawful conduct, SMA law firm had suspended operations, and COACH's investment therein is considerably devalued and diminished.

131. As a direct result of DEFENDANTS' unlawful conduct, Coach has suffered and continues to suffer serious economic losses.

132. As a result of the DEFENDANTS' intentional, reckless, and malicious actions COACH is entitled to punitive damages.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS does pray that this Honorable Court enter judgment in his favor and against the Defendants for:

a) The amount of Ten Million Dollars ($10,000,000.00), plus punitive damages and attorney fees;

b) The above-listed PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES; and

c) All other equitable and legal remedies that are fair, equitable and just.

## COUNT V
## CALIFORNIA PRODUCT DISPARAGEMENT/TRADE LIBEL/TRADE SLANDER

133. COACH restates and reasserts all prior allegations contained in this complaint as if fully stated within this Count.

134. DEFENDANTS used information from a UCLA branded video in the PODCAST EPISODE and particularly targeted COACH's bar membership in California.

135. DEFENDANTS knew they were subjecting themselves to California trade libel law when they published the PODCAST EPISODE on platforms based in California, targeting an audience in California, using California-sponsored content from UCLA, and attacked the California practice of COACH.

136. DEFENDANTS made the statements above that clearly and necessarily are understood to have disparaged the quality of COACH's legal services.

137. DEFENDANTS made these statements to people in California and all over the country beyond just COACH.

138. The statements were false.

139. DEFENDANTS knew the statements were false when they made them.

140. DEFENDANTS acted with reckless disregard of the truth or falsity of the statements.

141. DEFENDANTS knew that potential clients of COACH's services might act on reliance on

the statements, causing COACH financial loss.

142. COACH suffered financial loss because clients who considered using his services did not do so as a direct result and reliance on DEFENDANTS' statements, causing COACH to suffer direct financial harm

143. DEFENDANTS' conduct was a substantial factor in causing the harm to COACH.

**WHEREFORE**, the Plaintiff, EDWARD "COACH" WEINHAUS does pray that this Honorable Court enter judgment in his favor and against the Defendants for:

    d) The amount of Ten Million Dollars ($10,000,000.00), plus punitive damages and attorney fees;

    e) The above-listed PODCAST EPISODE EQUITABLE AND INJUNCTIVE REMEDIES (less the one related to Missouri as this count relates to California law); and

    f) All other equitable and legal remedies that are fair, equitable and just.

## Jury Demand

Pursuant to Federal Rule of Civil Procedure 38(b), PLAINTIFFS demand a trial by jury.

Dated: January 28, 2022                            Respectfully submitted,

                                           _/s/Edward "Coach" Weinhaus_
                               Edward "Coach" Weinhaus, MO Atty Reg. No. 72-255
                               LegalSolved LLC
                               10859 Piccadilly Sq. Dr Creve Coeur, MO. 63146
                               314 580 9580   | eaweinhaus@gmail.com
                               *Attorneys for Plaintiffs*